P. H. CONDRY, Executor of the Will of JAMES (M.) CONDRY
v. MRS. MOLLIE E. COFFEY, et al.

Western Section.   July 26, 1930.

2

W. N. Hickey, of Morristown, D. S. Beeler, of Rutledge, and G. W. Montgomery, of Tazewell, for appellant.

John Jennings, Jr., of Knoxville, A. T. Drinnon, of Morristown, and Jos. W. Wolfenbarger, of Rutledge, guardian ad litem, for appellee.

OWEN, J. This lawsuit involves the validity of the will of James M. Condry, who at the age of about eighty-one years died in Grainger county, December 22, 1928. His last will was probated in common form on December 29, 1928.

A petition contesting the validity of said will was filed in the county court of said county by Mrs. Mollie E. Coffey, a daughter, and Maude Henry McGinnis, a granddaughter of James Condry. P. H. Condry, named as executor in the paper writing contested, and his sister and brothers named as beneficiaries in said will, and Faun Farmer, a granddaughter, being the only child of Carrie Farmer, a deceased daughter of James Condry, were made parties defendant to said petition.

The petition alleged that the paper writing in controversy is not the will of said James Condry, deceased, for the reason that at the time that said paper was executed he was incompetent to make a valid will, was unduly influenced to make the same by his two daughters and three sons whose names are set out in the petition, and who as legatees and devisees thereunder received by far the more valuable portion of the estate of the said James M. Condry, deceased. The petition further charges that James M. Condry, at, the time said paper was executed, was greatly weakened, both in mind and body; that he was procured to execute said paper by the said chief beneficiaries thereunder at a time when he was so weakened by the ravages of disease and old age as that he was mentally incompetent to know and realize what he was about, and that in this weakened condition the said legatees and devisees thereunder, Haley M. Rosenbaum, Allie L. Coffey, W. M. Condry, Eugene Condry and P. H. Condry, procured him to execute said paper, and that said paper was procured by the undue influence and fraud of the said legatees and devisees, and is not the will of the said James M. Condry, deceased.

The defendants filed an answer denying the allegations and putting the cause at issue. The minor defendant was represented by a guardian ad litem. The case was regularly transferred to the Circuit court of Grainger county where P. H. Condry, as executor, filed his declaration in proper form.

The defendants filed a proper plea to this declaration averring that the paper writing was not the last will and testament of said James Condry.

The case was submitted to the Circuit Judge and a jury January 14, 1930, and at the conclusion of the plaintiffs' proof there was a motion for a directed verdict by the defendants which was sustained, the court making the following announcement in sustaining said motion:

"THE COURT: The proponents offer to introduce the purported will or paper writing in question. The defendants object to that because the legal requirements for the execution of a will devising real estate, have not been complied with. The court sustains that objection. This carries the record that this purported will was not written at the instance, request or dictation of the testator. It further appears that the subscribing witnesses did not sign the purported will at his request, or direction, and the only thing that the court remembers that the testator has said in the record so far with reference to the will, was, that at the conclusion of the reading of the will, 'It will do.' It is also a part of the record that before the reading of that will he was at the time concerned about his foot, he seemed to have trouble with his foot. I do not think that this will is entitled to be introduced under the record so far."

This ruling appears to have been made in the absence of the jury and upon the return of the jury the court charged as follows:

"THE COURT: Gentlemen of the jury, in your absence the question of whether or not the will should be introduced or not was raised. Objection was made to offering that will to you as evidence. The court sustained that objection. I don't think it is proper. I do not think the law has been fully complied with in the execution of the will. That is the opinion of this court, and, of course, you could not decide for or against it, unless you knew what you were deciding on, unless you knew what the will contained. I, therefore, instruct you to return a verdict in favor of the defendants or contestants in the case. If you all agree to that, hold up your right hands."

A motion for a new trial was entered and overruled and the plaintiffs and executor have assigned seven errors. By the 1st and 2nd errors it is insisted that the court erred in sustaining the contestants' motion for a directed verdict because the proof shows that the will was executed with all formalities of law, duly attested by two subscribing witnesses; that the testator, at the.

time of the making of the will, was of sound mind and that said will was executed without any undue influence; and that the court erred in excluding the reading of said will.

The remaining five assignments all go to the question of the admission or exclusion of certain testimony. The 3rd assignment being leveled at the action of the court in excluding the testimony of the witness, Joe T. Cameron, draftsman of the will, who testified in the absence of the jury as to certain conversations the witness had with two of the sons of the testator at the witness' home and as to directions that the witness gave to the two sons as to how they should have their father sign the will and as to how it should be witnessed.

The 4th assignment is in regard to excluding the answer of Dr. Enoch Idol, the attending physician to Mr. Condry in his last illness.

"Q. I believe that you have expressed the opinion that Mr. Condry's mind was all right?"

This was objected to because the attorney for the executor was repeating the testimony of the witness. An exception was made to it because it was not a proper question. The exception was sustained.

The 5th assignment is in regard to excluding certain evidence of the witness, P. F. Hopson, one of the subscribing witnesses.

The 6th assignment is in regard to certain evidence admitted on cross-examination by the witness, Mrs. Pearlie Hurst, the other subscribing witness to the will.

The 7th assignment complains of the court's action in sustaining the objection of the executor and the proponent, P. H. Condry.

We will dispose of the 1st and 2nd assignments together. At the outset we shall state that the record in this cause is an immense one of 325 pages, able and exhaustive briefs have been filed of nearly 200 pages. This case was very ably argued at the bar by both parties and the decisive question is as follows: Is the paper writing offered, the last will and testament of James Condry? It appears that James Condry was a widower. Living in his home was a married daughter, Mrs. Haley M. Rosenbaum. Mr. Condry had been married twice, the only child by his first wife is the contestant Mrs. Molley E. Coffey, whom it appears is an invalid and had been an invalid bedfast for about a year before the death of her father. Mr. Condry was eighty-one or eighty-two years of age. Mr. Condry was an illiterate man in the sense that he could neither read nor write, he could not sign his name but he was a man of unusually strong mind and more than ordinary intelligence. He owned farm lands consisting of about 800 acres,

some personal property in the way of live stock and money in the bank to the amount of $4,500. All of his property was worth probably from thirty to thirty-five thousand dollars. He was slightly deaf. The deceased became ill about two weeks before his death which occurred Saturday December 22, 1928. He was suffering from what his attending physician, Dr. Idol, called "heart block," that is to say, an organic derangement of the heart. He also had a sore on the side of the joint of his great toe to the right foot. This sore seemed to worry Mr. Condry very much, he thought it was a cancer. The heart trouble caused deceased much trouble in breathing, he would try to lie on his bed but in a few minutes he would have to be raised up and be carried to a chair then soon he would have to be removed from the chair back to his bed.

It appears that the will in controversy was signed on Wednesday morning about 9:30 o'clock before Mr. Condry died on Saturday. The will was prepared on Tuesday night at the home of Mr. Cameron, a notary public, and a man who had some experience in drafting wills. Mr. Cameron lived about four miles from Mr. Condry. This will was prepared at the request and dictation of P. H. Condry and Eugene Condry, two sons of the testator, P. H. Condry doing most of the suggesting and dictating. When they returned to their father's home on Tuesday night with the will the father was asleep. It appears that the two subscribing witnesses spent Tuesday night in the home of Mr. Condry, they sat up with him and waited on him but not at the same time. Mrs. Hurst, who lived in an adjoining county and who had some reputation as a cancer doctor, had been called in to examine Mr. Condry's foot which was giving him much pain and trouble. He seemed to think that he had a cancer. Mrs. Hurst said that she advised him that it was not a cancer and tried to get his mind away from thinking of his foot and his pain. Dr. Idol made about seven visits to Mr. Condry, the doctor testified that his patient suffered great pain; that he did not advise his patient that the end was near at hand as he believed in cheering up a patient to the best of his ability and holding out all hope possible; that he prescribed aspirin tablets for soothing his pains; that the real trouble with the patient was a defective circulation which caused the heart to beat irregularly or become blocked and that would greatly interfere with the patient's breathing; that the patient had developed some dropsical condition. The doctor testified that he thought the patient was of sound mind and that he was not an expert on mental diseases.

The facts surrounding the execution of the will are practically not in dispute and we will quote fully, from the witness, P. F. Hopson, one of the subscribing witnesses, as the other subscribing witness relates the facts as related by Hopson and as both of these parties spent Tuesday night with Mr. Condry before the execution of the paper the next morning, Mr. Hopson was asked and answered the following questions:

"Q. Did anything happen during the night that you sat up with him? A. Yes, sir.

"Q. Indicating he was out of his mind? A. Mr. Condry seemed to be racked with a heap of misery during the night, and at one time he dozed off to sleep, or, I don't know that he was asleep, but he seemed to rest for a few minutes. He woke up anyway and spoke, and says: 'I have got to get up again,' and I commenced helping him out of the bed, and while he was getting out of the bed he made mention to me that if I would get his lantern we would go over to my place where he could rest better. That was the only thing that I saw.

"Q. He said if you would get his lantern he could go over to your place and he could rest better. Is there anything else that occurred that night? A. In the way of insanity?

"Q. Yes? A. Not that I saw.

"Q. Were you there when the question of signing the alleged will came up? A. Yes, sir.

"Q. I will ask you to state if Mrs. Hurst was there that night? A. Yes, sir.

"Q. What time did she get there, do you know where she was when you went over there? A. To the best of my knowledge she wasn't there when I went, but I think about dark would be my best knowledge. I am not positive about that.

"Q. About what time did you get there in the evening? A. To the best of my knowledge I got there somewhere between sun-down and dark. Anywhere along about sun-down, or a little later.

"Q. So you sat up that night. The next morning, now, you go on in your own way and tell the jury everything that was said and done and everything else that came up about the making or signing and witnessing of the alleged will? A. That has been over a year ago, and I don't know whether I could get that together just like it was.

"Q. Tell it in your own way what you recollect about it? A. The first I heard of any will, I had a growth below my

eye that was giving me some trouble, and this lady Hurst that came there and stayed all night was a cancer doctor and that was one thing that made me go over there to sit up there that night. I wanted to meet the woman there. To the best of my knowledge it was that night when she came in, and the next morning she told me: Let's go out on the porch that she wanted to examine the growth that was under my eye. So we went out on the porch and she examined the growth.

"Q. Never mind what she told you. The court will not let you tell about your talk out on the porch? A. We were out there and Mrs. Hurst says there will be a will to sign this morning, and that was the first word of it that I got from anybody.

"Q. That was your first word of it? A. Yes, sir.

"Q. At that time who else was at the Condry home? A. Well, sir, I can't tell you. This man Webster Bullen was there some time that morning, but whether he was there at that time or not I do not remember."

This witness then testifies that Perry Condry and his sister, Haley Rosebaum, came into the room where their father J. M. Condry was, that he don't know which one had the paper writing, and that Perry said:

"We have the will, are you ready for us to read it," and that J. M. Condry said "Yes," and that Perry then handed the will to Mrs. Rosebaum and that she sat down in front of her father and read the will to him but did not pause during the reading, and that Perry then said:

"Father is this the way you want it," and that Mr. Condry replied "Yes, sir;" that Perry then signed his father's name to the will, and that Mr. Condry afterwards took hold of the top of the pen and Perry made his mark, and that he and Mrs. Hurst signed the will as witnesses.

He further testifies that he does not remember whether during the reading of the paper Mr. Condry picked at his sore foot.

On cross-examination this witness testified that his son married a daughter of Allie L. Coffey, who was a daughter of J. M. Condry, deceased. Allie at the time of the trial was the wife of a man named Adkins.

He further testifies that he lived four miles from the home of J. M. Condry and that in the night before this alleged will was claimed to have been executed, Condry wanted to go home with him.

He further testifies that at the time this request was made by Condry, that Condry was in such bad physical condition that he

would lie in the bed a little while and then he would get out and get in a chair and sit in the chair a little while and then go back to the bed and stay a little while. And that J. M. Condry was not physically able to have gone to his home. And he testifies:

"Q. You regarded that as the statement of a man of unsound mind, a crazy man didn't you? A. Mr. Condry was in a rack of misery.

"Q. You say he was in a rack of misery? A. Yes, sir he was a sick man and all the like of that but I couldn't say that Mr. Condry went crazy nor nothing like that.

"Q. Now then Mr. Hopson didn't you then and there think that that was the statement of a man whose mind was wrong? A. At the present time, of course, Mr. Condry's mind was not right when he made an assertion like that.

. . .

"Q. Mr. Hopson you have told the court and jury that he was racked with misery that night have you not? A. Yes, sir, he was a sick man.

"Q. And he was racked with misery from that time up until the next morning when his son came in there with a paper and told him here is the will, was he not? A. Well, Mr. Condry, after he made mention about the lantern, the next morning, I said—stood and talked to Mr. Condry, and his mind was as usual.

"Q. Did you hear his daughter, Haley, or Allie say that these frenzies he went into were due to the pills that they gave him? A. I heard them, yes, sir.

"Q. Did you hear both of them say they gave him pills and that they brought on these mental frenzies? A. I heard Allie say when I made mention about—I says, 'He talks a little flighty,' and Allie says: 'It is those pills we gave him.'

"Q. When was it Allie says it was those pills they gave him that made him talk that frenzied talk? A. A short time after he went off.

"Q. In the night? A. Yes, sir.

"Q. In all you talked with Mr. J. M. Condry when he was racked with pain, in all your talk with him he never, a single time, mentioned to you the making of a will, did he? A. No, sir, he did not.

"Q. He never, a single time, said to you: I am going to make a will, did he? A. No, sir, he did not.

"Q. The only man who mentioned the will there was his son Perry who claims to be the executor under that will; isn't that true? A. The only one.

"Q. His son came in with a paper and said Pappy, I have got your will; isn't that right? A. Yes, sir.

"Q. Mr. Condry didn't say; Perry, have you got my will, did he? A. I never heard him.

"Q. He never asked about it, before Perry came in and said Pappy, I have got your will, and then handed that paper writing to Haley; isn't that right? A. Yes, sir.

"Q. And Mr. Condry didn't say read it to me, did he? A. I don't remember as he did.

"Q. Don't you know that he didn't say a word about it? A. I don't remember it, if he told them to read it.

"Q. Isn't Perry the man who told Haley to read it? A. I remember him reaching it to her. I don't remember whether he told her to read it or not.

"Q. Didn't you tell the jury a while ago that Perry told Haley to read it? A. He reached it to her. I don't remember whether I told the jury that, or not.

"Q. Mr. Hopson, just think a minute now: Wasn't it Perry who told Haley to read that paper? A. I wouldn't be positive about it.

"Q. Mr. Condry didn't tell her to read it, did he? A. If he did, I do not remember it.

"Q. You don't remember it? A. No, sir, I do not.

"Q. You say she read it? A. Yes, sir.

"Q. When she would read a paragraph, she would stop and say; Father, do you understand that? A. No, sir.

"Q. She never said that, and you don't know whether J. M. Condry heard that or not, do you? A. No, sir, I do not.

"Q. When she got through reading this Perry said: Father is that all right, didn't he? A. Yes, sir.

"Q. Mr. Condry didn't say a word until Perry said that did he? A. No, sir.

"Q. When she was through reading the will, old man Condry didn't open his mouth, did he, eh? A. No, sir.

"Q. But Perry was doing the talking, and Perry said: Pappy is that all right? A. Yes, sir.

"Q. And you don't know whether he understood him, or not, do you? A. I do not know.

"Q. You don't know the exact words Mr. Condry used do you; didn't he say I reckon that will do, or something like that? A. No, sir.

"Q. Did you see him reach over there and pick at that sore toe while his daughter was reading that paper? A. If I did, I don't remember it.

"Q. You don't say he didn't do it? A. No, sir, I do not.

"Q. He did pick at that toe, didn't he? A. Yes, sir, at times he would. I saw him working at it.

"Q. He suffered and struggled for breath that night? A. It seemed he was breathing very hard.

"Q. His heart was beating in an irregular way? A. I couldn't tell you about that.

"Q. He was struggling for breath? A. He seemed to be very restless.

"Q. And when he was not struggling for breath, he was picking at that sore toe? A. I saw him working at the toe.

"Q. Were his legs swollen? A. Not a great deal.

"Q. Were they swollen? A. I don't remember that they were swollen enough that you could tell much about it or not, but I remember they were not swollen much, if any.

"Q. Isn't it your best impression that his legs were swollen? A. I could be mistaken, but I don't think that his leg was swollen much.

"Q. He was hard of hearing, wasn't he? A. Yes, a little bit.

"Q. He was partially deaf, wasn't he? A. When a man is hard of hearing, he is partially deaf.

"Q. You just talked what you had to talk loud, and sometimes had to repeat a statement for him in order for him to get it? A. I hardly ever did, because I talk very loud, myself.

"Q. If you didn't talk loud, he wouldn't understand, would he? A. I never had any trouble, because I talk loud.

"Q. You have told the jury you don't know whether he understood that paper or heard it? A. No, sir, I do not.

"Q. Mr. Condry never made any statement in detail about what he wanted to do with his property? A. Not in my presence, he did not.

"Q. He never mentioned the will in your presence? A. Not at all.

"Q. When Haley got through reading it, Perry sat down and wrote his name, didn't he? A. I couldn't tell you about that.

"Q. He didn't tell Perry to sign his name to that paper, did he? A. No, sir, I suppose not. I did not hear anything.

"Q. You were there looking at him and he didn't tell Perry to sign that paper, did he? A. If he did, I do not remember it.

"Q. You were there in a position to see and know, were you not? A. Yes, sir.

"Q. And when Perry got through writing his father's name to that paper, he says: Pappy touch the pen, didn't he? A. Yes, sir.

"Q. He said Pappy touch the pen; that is what happened, isn't it? A. Yes, sir, to the best of my knowledge.

"Q. And you as certain of that as you are of sitting in that chair? A. To the best of knowledge that is what he said to him.

"Q. And the old man did whatever Perry told him to do, didn't he? A. He did that.

"Q. He minded him; and then, when Perry had written his name to that paper that has been called his will, he said, Pappy touch the pen, and the old man minded him, didn't he? A. He touched the pen.

"Q. And that was the last thing that the old man said or did on that occasion, isn't it? A. In my presence.

"Q. The old man didn't ask you to sign that paper, as a witness, did he? A. No, sir.

"Q. Perry is the man that told you to do that, isn't he? A. Yes, sir, he asked me if I would sign it.

"Q. Perry asked you that, didn't he? A. Yes, sir.

"Q. Had the old man gotten back in the bed at that time? A. I don't remember.

"Q. The old man never asked you to sign that will as a witness, did he? A. No, sir.

"Q. But Perry asked you? A. Yes, sir.

"Q. The old man had gotten in the bed when Perry asked you to sign it, hadn't he? A. I don't remember.

"Q. And then Perry asked Mrs. Hurst to sign it, didn't he? A. Yes, sir.

"Q. And Mr. J. M. Condry didn't ask Mrs. Hurst to sign it, did he? A. Not in my presence.

"Q. Well you were there? A. I was there.

"Q. And you and Mrs. Hurst both signed one right after the other, didn't you? A. Yes, sir.

"Q. And you did it because Perry Condry asked you to do it, didn't you? A. Yes, sir.

"Q. You heard everything Mr. Condry said; you couldn't be mistaken about that? A. While I was there in his presence, I did.

"Q. Mr. Condry didn't ask you, nor Mrs. Hurst to sign it? A. Not in my presence.

"Q. And you don't know whether Mr. J. M. Condry knew that you had signed it as a witness, do you? A. Well no, sir, I do not.

"Q. Mr. J. M. Condry didn't say: This is my last will and testament, and I hereby declare it to be such, and I request you to sign it as a witness, did he? A. No, sir.

"Q. He didn't say that, did he? A. No, sir.

"Q. He never said any such thing at all? A. No, sir.

"Q. At whose request did you sign it? A. How is that?

"Q. You signed it at Perry Condry's request, didn't you? A. Yes. He came in there and asked me and Mrs. Hurst to go in and sign it.

"Q. Where were you? A. We were in the room by the fire by Mr. Condry.

"Q. And you signed it because Perry asked you to? A. Yes, sir.

"Q. You don't know whether J. M. Condry knew that you were signing it as a witness, do you? A. No, sir, I do not. I couldn't tell you whether he was watching me or not."

It appears that Mrs. Rosenbaum, who read over the will to her father, and Perry Condry, a son who signed his father's name, Mr. Hopson and Mrs. Hurst, who witnessed the will, were the only persons in the room at the time the will was signed. It appears that Mrs. Hurst hesitated about becoming a witness to the will. She said that she lived in an adjoining county and did not want to come to court. She said that she told the wife of Eugene Condry that it did not look like the will would stand because Mr. Condry was in a weak state, that his mind did not seem sufficient to draw up a will. Mrs. Hurst among other things testified as follows:

"Q. Had Mr. Condry ever said anything to you about wanting to make a will? A. No, sir.

"Q. Had you ever heard him say anything to anybody about wanting to make a will? A. No, sir.

"Q. Mrs. Hurst, from what he had said and done there in her presence, these things that you have detailed here to the jury, wasn't it your opinion that he was a man of unsound mind? A. Well, I will tell it this way and let the jury judge that part of it. He spoke different times during all this one word that would be wrong that didn't come into its place, I will just say. You know, he would be in a conversation, or something of the kind, complaining of his weakness and he would put in a word now and then that didn't belong with

the other part of it anyhow, something wrong, or something in his mind that didn't join in with the conversation. He done that different times. And about this foot: He would lay it in my lap and he would worry with it, but if I would tell him it wasn't a cancer, he would come back again and worry again about things I had told him over and over, he would still worry with me until I would joke him—until I had joked him and got him pacified, until it looked like his mind was worried. I couldn't say that he was crazy but his mind was physically weak. I don't know what you call it." And she testified also:

"Q. How long was that before they claim he made the will when he wanted to go home with you and stay a week? A. That was after the will was made.

"Q. How long? A. Well, I couldn't say. The will must have been made something like nine o'clock, and this was about ten o'clock, the best I remember.

"Q. About ten o'clock he wanted to go home with you and stay a week? A. Yes, sir.

"Q. At that time was he able to go from the bed to the chair? A. When he got to the chair he had to take hold of it to help him to the chair or mantle to get to the bed.

"Q. What did you say to him? A. I told him, he was too weak, that he could not cross the room, and to wait until he got better, that it was too far for him to go. He wanted to go and was very restless, and we could not leave him. I still was with him and tried to get him satisfied before I left him. I hated to walk off and him wanting to go, and so I tried to pacify him, but I went off and him wanting to go home with me.

"Q. He wanted to go like a child? A. It seemed that he was. I have seen children wanting to go home with people. He was like that.

"Q. And he was just like a child, wanting to go home with you? A. It seemed that way. He wanted to go to have his foot treated, was what he said.

"Q. He wanted to have his foot treated? A. Yes, sir, to stay with me a week.

. . . . . .

"Q. When Mr. Condry got in his chair, did he then ask anything about a will? A. No, sir, not to me.

"Q. He just sat there, did he? A. Yes, sir.

"Q. Then Perry handed this paper to his sister, Haley, and told her to read it? A. Yes, sir.

"Q. And she read it. She didn't stop as she read a portion and asked him if he understood that, did she? A. No, sir.

"Q. You don't know whether he heard her or not, do you? A. I don't know anything about that. He sat by her and listened; that is all I know.

"Q. You don't know whether he understood it or not, do you? A. No, sir.

"Q. He never said he understood it? A. No, sir.

"Q. While she was reading that paper, he bent over two or three times picking at this sore foot, didn't he? A. Yes, sir.

"Q. He spent as much time picking at that foot or more picking at that foot while that reading was going on, than he did doing anything else; that is all he did; that was the only thing he did; he didn't move, he didn't work his eyes or look over the house? A. He looked at his foot; he looked at his foot.

"Q. When he was picking and working at his foot, did he look at it? A. He never changed his eyes. He was sitting there the best I remember kind of like that (indicating), kind of looking down.

"Q. He looked down? A. Yes, sir. He did not look up the best I remember at anything.

"Q. And when this reading was finished, he didn't say a word, did he, until somebody had said something? A. No, sir.

"Q. He made no statement? A. He made no statement until they asked him if that was the way he wanted it fixed.

"Q. Then it was that Perry said: Pappy, this is your will; what do you think of it? A. He says, I think he said: Father, you have heard the will read. Is it fixed the way you want it?

"Q. Then what did he say? A. The best I remember, he says: It will do.

"Q. He said, It will do? A. That is what I think he said I wouldn't be positive on anything, but that is the way I remember it.

"Q. He didn't say anything about his sanity, did he? A. No, sir.

"Q. Perry then took a pen and ink and signed his father's name to that paper, didn't he? A. Yes, sir.

"Q. His father didn't ask him to do it, did he? A. No, sir.

"Q. He didn't tell him to do it? A. No, sir.

"Q. Perry did that? A. Yes, sir.

"Q. And then his father didn't say: Let me touch the pen and make my mark, did he? A. Not a word was said by him.

"Q. Perry told him to touch the pen, didn't he? A. Yes, sir.

"Q. Then Perry said touch this pen? A. He says I will make your mark and you touch the pen.

"Q. I will make your mark and you touch the pen? And the old man touched it, didn't he? A. Yes, sir.

"Q. And that was all that passed between Mr. Condry and anybody there on that occasion? A. Yes, sir.

"Q. Mr. Condry didn't ask you to sign that will, did he, he didn't do it? A. No, sir.

"Q. And you didn't sign it at his request, did you? A. No, sir.

"Q. Mr. Perry Condry asked you to sign that will, didn't he, as a witness? A. Yes, sir.

"Q. And you signed it at his request, at Perry's request, didn't you? A. Yes, sir.

"Q. You did it because he asked you to do it, didn't you? A. Him and Haley both insisted that I witness it.

"Q. He and Haley both insisted that you witness it, they insisted that you do it? A. Yes, sir.

"Q. How long was it after Perry Condry signed his father's name to this paper that they call a will, how long was it until Perry and Haley persuaded you to sign that paper as a witness? A. They had asked us beforehand, before the will was read. . . .

"Q. You say your best impression is they put the old man back in the bed? A. Yes, sir; that is the best I remember. I wouldn't be positive.

"Q. Before Perry said to sign it and before you did sign it? A. I think so.

"Q. You don't know what condition the old man was in as he lay there in the bed; were his eyes open or shut? A. No, sir, I don't remember.

"Q. You don't know whether he was asleep or awake, do you? A. No, sir.

"Q. You don't know whether he knew that you were to sign this paper as a witness? A. No, sir.

"Q. You do know that he didn't ask you to do it? A. That is all.

"Q. And he didn't ask Hopson to do it? A. No, sir.

"Q. Hopson signed it under the same circumstance that you did? A. Yes, sir."

At one part of this witness', Mrs. Hurst, testimony, she was asked:

"Q. What would he do, meaning Mr. Condry, when people told him to do anything or not do anything? A. He was biddable to anything that came before him. I didn't see him contrary to anything.

"Q. He was biddable, was he? A. Yes, sir.

"Q. That is, he did what he was told to do? A. Yes, sir, there was nothing, I never seen anything to the contrary out of him and I mentioned about him being so good in that way.

"Q. Meaning whatever they wanted him to do? A. Whatever you wanted him to do or say, he seemed to want to do. What we told him was for the best; he seemed to be a mighty easy patient."

In support of a motion for a directed verdict and in objection to the introduction in evidence of the paper writing relied upon by the proponents in this case as the last will and testament of J. M. Condry, deceased, the contestants made the following argument:

The undisputed evidence in the case shows that that paper writing was never executed by the deceased J. M. Condry as his free, voluntary conscious act. The proponent plaintiff, Mr. P. H. Condry says that his father told him to go down there and have this paper prepared; that his father, so far as he knows, did not know that he was going for that purpose. And on the further ground that this paper writing comes here in the same aspect, upon the same footing, and shrouded by and developed in the same cloud of suspicious circumstances as would invest and characterize it, had it been, in fact, written by Mr. Condry and his brother, Eugene, because, what a man does by another, he does himself. It is undisputed that this paper writing was prepared as it was prepared at the instance, at the dictation of P. H. Condry and Eugene Condry, not in the presence of the testator. The testator did not dictate it, did not utter a single word about its contents. Then, these two sons come here, and P. H. Condry testifies that he, Eugene, Haley and Allie had discussed this matter. There is but one inference to be drawn, and that is that these two boys went down there on this occasion at night, because they knew and realized that their father was in extremis, that he was fatally ill. After this paper was procured to be written, as the undisputed proof shows it was written, he brings it back, and the undisputed

proof is that his father knew nothing about it, made no inquiry about it, said nothing about it, and he comes in, and it is witnessed by the attesting witnesses. He says that he first came in and made no effort to call it to his father's attention. And then, according to his own testimony, he closed the door, put his hand upon the door, and his father at that time who was sitting in a chair, and said to his sister: I have got father's will here, read it to him. His father had made no request that it be read, did not know such a thing was there. His sister read it, he says, in an ordinary tone of voice. The undisputed testimony is that he was partially deaf. He did not ask both of these parties to witness it. His sister was asked if she could testify that their father heard it. None of them could say that he heard it. They were all asked if he said he heard it and they all said that he did not say he heard it. They were all asked if he said he understood it, and they all said he did not say he understood it. Mrs. Hurst and Mr. Hopson say, when the reading was completed, that Perry Condry addressed his father, and said: Father, is this your will, is this like you want it: And the attesting witnesses say he said: "That will do." Then they all agree that the father did not ask him to sign his name to it, and then, of his own volition, without any suggestion from his father to sign his father's name to it, the proof is, and it is undisputed, that his father was failing, he was like a child, and he turned to him, and says: Touch the pen, and he touched the pen. Then, Mrs. Hurst said that his father got back in the bed. He don't know whether he got back in the bed or not, but Mrs. Hurst says he got back in the bed. Then this man requested these attesting witnesses to sign it. The law is that the testator himself must sign or direct somebody to sign it, and the law is he must request somebody to sign as witnesses or he must do that which the law says is tantamount to a request. That is, he must sign and hand the paper to the attesting witnesses, or he must declare it as his will. The law goes further and says, it is the duty of the attesting witnesses to know—they must know—that the testator understands the will and appreciates or realizes its contents, what he is doing, what he is about to do. None of those facts are in this evidence.

In reply to this motion, learned counsel for the proponents made the following, clear-cut and frank statement:

If your Honor please: I am going to be absolutely frank with the court and with counsel. This case has reached a point now where a naked proposition of law on the facts adduced is presented. A decision of that naked proposition of law in connection with the facts is conclusive of this litigation. There has been no effort on

our part to withdraw from it. It was the truth and we brought it out. It did not require any cross-examination to bring it out; and, therefore, nothing that can be introduced hereafter on either side will help or hurt that proposition. We have drifted off into a field of opinions as to sanity or insanity. I would refer your Honor to the holding made by our Supreme Court where the court sustains a motion for a directed verdict in a law case reported in 4th Appeals cases. We are not in the attitude of admitting anything, but we are of the opinion that the propositions of law which are controlling in this case had better be settled.

These two statements from the opposing counsel before the lower court fairly present the nature of the arguments upon this appeal. The validity of the will, proposed to be established, depends upon the validity of the attestation at the request or with the assent of the testator and whether or not he knew, at the time, his name was signed to the paper and he made his mark, what he was signing and for what purpose. No formal request was necessary to come from Mr. Condry but it should be made to appear that he requested the two witnesses to attest or witness his will. The proof fails to show or establish the fact that Mr. Condry ever requested either of the witnesses to sign the paper writing or that he knew that they signed the paper as witnesses. The proof establishes the fact that when Mr. Condry made his mark, he was placed on the bed and the witnesses do not know whether his eyes were closed or whether he was conscious or unconscious when the paper was attested. Neither asked Mr. Condry if it was his will.

At the conclusion of the reading of the will, he said, "that will do." Whether he meant that he wanted the reading to stop so he could return to the bed or whether he understood and approved of the paper that had been read to him is in doubt.

The statute of Tennessee in regard to wills, Shannon's Code, sec. 3895, is as follows:

"No last will or testament shall be good or sufficient to convey or give an estate in lands, unless written in the testator's lifetime, and signed by him, or by some other person in his presence and by his direction, and subscribed in his presence by two witnesses at least, neither of whom is interested in the devise of said lands."

This statute is founded on the section of the statute of frauds relating to wills (29 Car. II, ch. 3), which provides that a devise of lands shall be attested and subscribed in the presence of the testator by three or four credible witnesses.

The English courts have always held, construing the statute, that the witnesses need not know the instrument they were at-

testing was a will. They said the question was whether there was an acknowledgment in fact by the testator to the subscribing witnesses, though there was none in words, that the instrument was his will; for if, by what the testator did he must in common understanding and reasonable construction be taken to have acknowledged the instrument to be his will, the attestation thereof would be considered as complete. White v. British Museum, 6 Bing., 310; Ellis v. Smith, 1 Ves. Jr., 11; Wright v. Wright, 7 Bing., 457.

"It is essential to the exercise of the testamentary power that the testator should understand the nature of the act and its effects; should understand the extent of the property of which he is disposing; should be able to comprehend and appreciate the claims to which he ought to give effect; and with a view to the latter object, that no disorder of the mind should poison his affections, pervert his sense of right, or prevent the exercise of his natural faculties; that no insane delusion should influence his mind in disposing of his property, and bring about a disposal of it which, if the mind had been sound, would not have been made. If the human instincts and affection, or the moral sense, become perverted by mental disease; if insane suspicion or aversion take the place of natural affection; if reason and judgment are lost, and the mind becomes a prey to insane delusions calculated to interfere with and disturb its functions, and to lead to a testamentary disposition due only to their baneful influences; in such a case, it is obvious that the testamentary power fails, and that a will made under such circumstances ought not to stand." Pritchard on Wills (2 Ed.), sec. 101.

"The imbecility or feebleness of mind resulting from extreme old age, is another cause of testamentary incapacity. Not that the law fixes the limit beyond which the testator cannot exercise the testamentary disposition of his property intelligently; but it takes into account the well-known and familiar instances of the loss of a person's memory and mental power from old age, and accepts it as evidence in those cases where senile decay is alleged, as to the ability of an aged person to rightly and understandingly make his will. Extreme old age may, it is true, raise some doubt of capacity, but only so far as to excite the vigilance of the court; 'yet if a man in his old age become a very child again in his understanding, or is become so forgetful that he knows not his own name, he is then deemed no more fit to make his testa-

ment than a natural fool, or a child, or a lunatic person." Pritchard on Wills (2 Ed.), section 119.

"The will must be signed by the testator or by some other person in his presence and by his direction." Pritchard on Wills (2 Ed.), section 213.

"The writing of the testator's name, with the words 'his mark,' done by a third person, to identify the testator's signature by mark, is not the signing of the testator's name by his direction, within the contemplation of the statute, but is a signature by the testator's own hand." Pritchard on Wills (2 Ed.), section 216.

"The witnesses must subscribe the will in the presence of the testator. This implies two things: First, that the witnesses when subscribing must be in such a situation that the testator may see the act done and know that the paper which they attest is his will; and, secondly, that the attestation must be made while the testator is in a conscious state. If the act is done in a secret or clandestine manner, it cannot be regarded as an attestation in his presence, although done in the same room and while he is in a conscious state; if done in his bodily presence while he is unconscious, it is a void attestation, as where the testator, after having signed and published his will, and before the witnesses had subscribed their names fell into a state of insensibility. But it is not necessary that the witnesses see the testator sign, or that they sign in the presence of each other, if they sign at the request of the testator, and in his presence, and after he has signed." Pritchard on Wills (2 Ed.), section 219.

"It is the duty of the witnesses, before they subscribe the will, to know, from the testator himself, that he understands and approves the contents of the instrument he is executing as his will. They should also be satisfied, from their knowledge of the testator's mental state, that he is of sound and disposing mind and memory. By placing his name to the instrument, the witness in effect certifies to his knowledge of the mental capacity of the testator, and that the will was executed by him freely and understandingly, with full knowledge of his contents. Such is the legal effect of the signature of the witness when he is dead or out of the jurisdiction of the court, and he is not justified in becoming a witness unless satisfied on these points." Pritchard on Wills (2 Ed.), section 228.

In Wisener & Brown, Executors, v. Maupin and Wife, et al. (2 Baxt.), page 342, our Supreme Court held as follows in a will contested:

"The question of testamentary capacity is, 'whether the testator, at the time of making the will, knew and comprehended what he was doing.' A will is not valid unless the testator intends of his own free will to make such a disposition, and is capable of knowing what he is doing and understanding to whom he is giving his property, and in what proportion, and whom he is depriving of it."

"Where the will was not read to the testator, and he was illiterate, it must be shown that he knew its contents, and this may be shown by circumstances, and where the testator was old, illiterate and diseased, full and satisfactory proof that he knew the contents of the will is required."

In the case from which we have just quoted our Supreme Court in speaking of the testator said:

"——in his second childhood; that his memory had failed him; that his conversation was disconnected and flighty; in a word, that he was weak, very weak, both in body and mind. There was testimony tending to show that his young wife controlled him as a child; that he but did her bidding."

In the case of Logue, Executor, v. Albert Stanton, et al., 5 Sneed, page 97, our Supreme Court approved of the following charge in which case the jury had found against the will:

"It must have been acknowledged by him in the presence of two witnesses, who attested it as such, in his presence, and in the presence of each other and at his request. He explained that this request to attest might be by words or actions which indicated a desire that it should be witnessed by the persons subscribing it. Handing out the will, acknowledging his signature, pointing to the paper, or acquiescing in the acts of another to that effect, or any other acts of the kind, would be sufficient."

"When the testator is in extreme old age, imbecile in mind, surrounded by interested parties, incapable of reading or writing, etc., something more than ordinary ground of assurance that he had knowledge of the contents of his will must be required." Key v. Holloway, 7 Baxt., p. 576.

"The fact that a will is executed by a testator by making his mark is prima facie evidence of his inability to write, or to read writing, and in such a case there ought to be evidence by the attesting witnesses in explanation of the manner of signing, or evidence of the knowledge of the contents of the will, to make the formal execution complete, or to entitle the plaintiffs to a verdict, if no counter proof is offered." Bartee v. Thompson, 8 Baxt., p. 508.

Appellants rely upon the case of Howell v. Brown, 7 App. Rep., 380. In that case it was held that "while the testator did not expressly request any of the parties to subscribe as attesting witnesses, and neither did he make any comment of approval or disapproval of the procedure of the witnessing of the will, but he was rational and was not suffering at the time, and was in possession of his faculties and was conscious of his surroundings."

The maker of the will in the case from which we have quoted, had his will written by his physician just before he was going to submit to a major operation. The will was read over to the patient by Dr. Caldwell, who had written the will according to the patient's request and when signed the physician said, "This will should be witnessed by two witnesses," and he called on two other physicians, in the room at the time with the patient, who in the presence of the patient signed their names as witnesses. Said the Court of Appeals, speaking through Judge Crownover:

"After a thorough examination of the record and the law on the subject we are satisfied that he was fully conscious of his surroundings and knew what was being done with respect to witnessing his will, and acquiesced therein to the extent that he consented to the request of Dr. Caldwell."

"The proof shows that the testator was of sound mind and that the will was drafted at his request, and that the witnesses subscribed their names at the request of the draftsman, in the presence of the testator, and that he was conscious of what was being done at the time; there was no suggestion of undue influence; therefore, we are of the opinion that he consciously assented to the request of his draftsman, which is sufficient under the law." Howell v. Brown, 7 Tenn. App. Rep., 384.

We are satisfied that the undisputed proof establishes the fact that Mr. Condry was so ill, so childlike, doing whatever he was told to do, so feeble in mind and body, at the time of the signing of the paper offered as his last will and testament, he did not possess testamentary capacity, did not know the full purport and meaning of the instrument he was signing. He made no request to have witnessed as his last will and simply made his mark to the instrument, at the dictation of his son and we find from the undisputed facts that the requirements to establish a valid will were not present and a part of the execution of the paper offered in evidence to be the last will and testament of J. M. Condry, deceased.

It results that the first two assignments of error are overruled, As to the other assignments of error they are immaterial. The evidence offered was either incompetent as being immaterial or was incompetent because conversations between the testator and

executor named is not competent. It is immaterial whether Mr. Condry could secure the services of Mr. Montgomery to write his will or not. He didn't write it so that is an end to that question. Some of the evidence excluded over the objection of the proponents was hearsay and even had this evidence been admitted it would not have changed the result because the validity of the paper, proposed as the last will and testament of Mr. Condry, depends upon the facts established in the room of Mr. Condry the morning he made his mark to the paper.

It results that all the assignments of error are overruled and disallowed. The judgment of the lower court is affirmed. Appellants and their sureties on appeal bond will pay the costs of the appeal for which execution will issue.

Heiskell and Senter, JJ., concur.